In re the CUSTODY OF the CHILD OF Jason Billy WILLIAMS, petitioner, Respondent,

v.

Korrin Ann CARLSON, Appellant.

No. A04–2223.

Court of Appeals of Minnesota.

Aug. 2, 2005.

Kent D. Marshall, Marshall Law Office, Barrett, MN, for respondent.

Jeffrey D. Skonseng, Krekelberg, Skonseng & Hastings, P.L.L.P., Fergus Falls, MN, for appellant.

Considered and decided by WILLIS, Presiding Judge, KLAPHAKE, Judge, and SHUMAKER, Judge.

## OPINION

KLAPHAKE, Judge.

The district court adjudicated respondent as the father of the parties' child and awarded him sole physical custody. On appeal, the mother argues: (1) the genetic testing showing that respondent was not the father of the child rebuts any presumption raised by the parties' signing of a recognition of parentage; (2) the record does not support the court's findings on the best interests factors; and (3) the court committed reversible error in denying her motion for new trial, when the test results were not known until after trial.

While we agree that the district court erred in ordering the genetic testing, we conclude that such error was harmless. Because (1) appellant failed to timely move to vacate the recognition of parentage; (2) the record supports the court's findings regarding the best interests factors; and (3) no errors occurred during trial that unreasonably prejudiced appellant, we affirm.

## FACTS

Appellant Korrin Ann Carlson, n/k/a Korrin Ann Angevine, and respondent Jason Billy Williams were never married. They became romantically involved in February 1996, but were not living together at the time of J.J.W.'s birth on January 17, 2000. Respondent is identified on J.J.W.'s birth certificate as the father, and J.J.W. has respondent's surname. Two days after J.J.W.'s birth, the parties executed a recognition of parentage pursuant to Minn. Stat. § 257.75 (1998). Neither party has revoked or moved to vacate the recognition of parentage.

Respondent has been very involved in J.J.W.'s life since his birth. For the first two years, the parties agreed that instead of hiring a babysitter, respondent would care for J.J.W. Respondent has lived his entire life on his parent's farm in Hewitt, Minnesota, and is employed full time in the general farming operations. Respondent took care of J.J.W. at the farm during the day, and the parties alternated responsibility for his care in the evening. Respondent's mother has also been extensively involved in caring for J.J.W.

During the parties' relationship and since J.J.W.'s birth, appellant has lived at six different locations; been employed by eight different companies, primarily in part-time positions; and has had three sexual relationships, including the one with respondent. At the time of the district court's decision, appellant was married and living in a two-bedroom mobile home in Little Falls, Minnesota, with her husband, Shawn Angevine. Also living in the mobile home were J.J.W.; S.A, Angevine's son from a previous relationship with a third party; and K.C., appellant's daughter born from a previous relationship with a third party. Appellant was also pregnant at the time of trial.

One of appellant's sexual partners, Jeremiah Rapier, has a criminal record and a history of domestic violence. On at least one occasion during appellant's romantic involvement with Rapier, he assaulted her in the presence of J.J.W. and K.C. Appellant subsequently terminated the relationship.

In July 2002, appellant petitioned for an order for protection (OFP) against respondent. Pursuant to the parties' stipulation, the OFP, which contained no factual findings that respondent committed any acts of domestic abuse or assault on appellant, was entered by the district court and ordered respondent to have limited contact with appellant. During the OFP proceedings, appellant admitted that respondent was the father of J.J.W. As part of the OFP proceedings and pursuant to the stip-

ulation, the court awarded sole physical and legal custody of J.J.W. to appellant subject to respondent's right of visitation. In fact, the parties continued to equally share in the actual physical custody, parenting, and caretaking of the child from the entry of the OFP to the time of trial in this matter.

In September 2002, respondent filed a petition to establish custody and visitation pursuant to Minn.Stat. §§ 257.75, subd. 3(1); 257.541, subd. 3; and 518.156, subd. 1 (2002). Appellant filed an answer admitting that respondent is the father of J.J.W. and requesting that the court order "genetic testing to establish paternity." The district court granted the request and ordered testing.

On June 12, 2003, the child support magistrate for Cass County, Minnesota, issued findings of fact, conclusions of law, and an order establishing respondent's child support obligation. Respondent was identified as the father of J.J.W.; he has fully complied with the order and all subsequent orders entered by the magistrate.

Prior to trial on the custody issues, the district court appointed a guardian ad litem to represent the best interests of J.J.W. The guardian ad litem made an independent investigation, which included personal visits with the parties, and filed a written report. She recommended that the parties share joint legal custody and that respondent be awarded sole physical custody of J.J.W., with liberal visitation granted to appellant.

The district court held a custody trial on March 2, 2004. Although the court and the parties did not receive the test results until May 14, 2004, the court considered the results as part of its judgment. Ultimately, the results excluded respondent as the biological father of J.J.W. The court nevertheless awarded respondent sole physical custody of J.J.W., with liberal vis-

itation to appellant and joint legal custody to both parties. Appellant filed a posttrial motion for amended findings, conclusions, and order, or, alternatively, a new trial. The court granted various portions of the motion for amended findings, but denied the motions for amended conclusions of law and order, and for a new trial. This appeal followed.

## ISSUES

1. Did the district court err when it declared the existence of a parent and child relationship?

2. Did the district court abuse its discretion when it awarded respondent sole physical custody?

3. Did the district court abuse its discretion when it denied appellant's motion for a new trial?

## ANALYSIS

An appellate courts review of custody determinations is limited to determining whether the district court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *Silbaugh v. Silbaugh,* 543 N.W.2d 639, 641 (Minn.1996). Determinations of child custody must be based on the best interests of the child. Minn. Stat. § 518.17, subd. 3(a)(3) (2004). When considering the best interests of the child, the district court must make detailed written findings that reflect the courts consideration of the factors defined by statute. *See* Minn.Stat. § 518.17, subd. 1(a) (2004); *Rogge v. Rogge,* 509 N.W.2d 163, 165 (Minn.App.1993), *review denied* (Minn. Jan. 28, 1994). A district court's findings of fact will be sustained unless they are clearly erroneous. *Pikula v. Pikula,* 374 N.W.2d 705, 710 (Minn.1985). Interpretation of statutes is a question of law that this court reviews de novo. *Dorman v.*

*Steffen,* 666 N.W.2d 409, 411 (Minn.App. 2003).

## I.

Appellant argues that the district court erred by failing to declare the nonexistence of the father-child relationship based on the genetic test results, which excluded respondent as the child's biological father. In her answer to respondent's petition, appellant admitted that "[respondent] and [appellant] are the parents of [J.J.W.]" and that they "signed a Recognition of Parentage on January 19, 2000." She also requested genetic testing "to establish paternity."

 When the mother and father of a child sign a recognition of parentage (ROP), they state and acknowledge under oath that they are the biological parents of the child and wish to be recognized as such. Minn.Stat. § 257.75, subd. 1 (2004). If the ROP is not revoked within 60 days after its execution, if there is no presumed father, or if no other man has signed an ROP under Minn.Stat. § 257.55, subd. 1(g) or (h) (2004), the "recognition has the force and effect of a judgment or order determining the existence of the parent and child relationship." Minn.Stat. § 257.75, subd. 3 (2004). Once the ROP has been properly executed and filed, "if there are no competing presumptions of paternity, a judicial or administrative court may not allow further action to determine parentage." *Id.* "The judgment or order of the court determining the existence or nonexistence of the parent and child relationship is determinative for all purposes." Minn. Stat. § 257.66, subd. 1 (2004).

 Here, the district court ordered genetic testing pursuant to Minn.Stat. § 257.62, subd. 1(a) (2004), which states:

The court ... may, and upon request of a party shall, require the child, mother, or alleged father to submit to blood or genetic tests. A mother or alleged father requesting the tests *shall file with the court an affidavit either alleging or denying paternity and setting forth facts that establish the reasonable possibility that there was, or was not, the requisite sexual contact between the parties.*

(Emphasis added.) However, appellant did not provide the requisite affidavit denying paternity. *See Witso v. Overby,* 627 N.W.2d 63, 69 (Minn.2001) (discussing affidavit required by section 257.62). To the contrary, in her answer she admitted that respondent was the father and only sought to "establish paternity" by requesting the tests. We therefore conclude that genetic testing was not permissible under Minn. Stat. § 257.62, subd. 1.

 We further conclude that, contrary to the district court's analysis, this case does not involve a presumption of paternity. The district court indicated that "Minn.Stat. § 257.55, subd. 1(e) provides that a man is presumed to be the biological father of a child if 'he and the child's biological mother acknowledge the paternity of the child in a writing signed by both of them under section 257.34 and filed with the state registrar of vital statistics.'" Section 257.34, however, involves a declaration of parentage (DOP), which declares and acknowledges under oath that the signatories are the biological parents of the child. Minn.Stat. § 257.34, subd. 1 (2004). The execution of a DOP "creates[s] a presumption that the signatory is the biological father of the child for the purposes of [the Parentage Act]." Minn. Stat. § 257.34, subd. 1(c). This case does not involve a DOP, nor does it involve competing presumptions under Minn.Stat. § 257.55.

Rather, this case involves the execution of an ROP with no competing presump-

tions of paternity. In order to overcome the force and effect of an ROP under these circumstances, a party must bring an action to vacate "within one year of the execution of the recognition or within six months after the person bringing the action obtains the results of blood or genetic tests that indicate that the man who executed the recognition is not the father of the child." Minn.Stat. § 257.75, subd. 4(a) (2004). The burden of proof is on the moving party, who must request vacation on the basis of fraud, duress, or material mistake of fact. Minn.Stat. § 257.75, subd. 4(b).

Here, appellant has failed to meet these requirements. She has not brought an action to vacate the ROP within one year after its execution or by November 2004, which is six months after May 2004, the date that she obtained the results of the genetic tests. Nor has she alleged vacation of the ROP is necessary due to fraud, duress, or material mistake of fact. We therefore conclude that the district court did not err when it declared the existence of a parent and child relationship between respondent and J.J.W.

Even if we were to construe the proceedings here as a timely request to vacate the ROP on the basis of newly discovered evidence, we would still affirm the district court's decision. The district court also noted that "because no other man is presumed to be the child's father, [respondent's] presumption of paternity under [section 257.55, subd. 1(d)] is conclusive." See Minn.Stat. § 257.55, subd. 1(d) (2004) (stating man is presumed biological father if "he receives child into his home and openly holds out the child as his biological child"). We therefore affirm the district court's declaration of a parent and child relationship between respondent and J.J.W.

## II.

Once paternity has been recognized through an ROP, the father may petition for rights of custody or parenting time in an independent action under Minn.Stat. § 518.156 (2004). See Minn.Stat. § 257.541, subd. 3 (2004). "The proceeding must be treated as an initial determination of custody under section 518.17." Id. Here, the court applied the best interests factors to determine custody.

Appellant asserts that the record does not support the court's findings on the best interests factors. She specifically argues that: (1) she is the primary caretaker; (2) the court overlooked J.J.W.'s interactions and relationship with S.A. and K.C.; and (3) the court incorrectly found that J.J.W. was better adjusted to living with respondent. Rather than addressing the 13 factors individually, appellant's specific challenges are addressed.

 The "primary caretaker" is "the person who provides the child with daily nurturance, care and support." *Pikula*, 374 N.W.2d at 711. The court found that both parties have been intimately involved in raising J.J.W. since birth. Both have prepared meals, provided baths and medical care, and attended to him at bedtime and in the morning on an equal basis. The court stated that the facts do not support a preference for primary caretaker in either party. When the facts demonstrate that both parents share responsibility for and performance of child care in an entirely equal way, then no preference arises. *Id.* at 713–14. Review of the record supports the court's finding of shared parenting.

The court noted that J.J.W. is emotionally bonded and assimilated into both families and has "a particularly close relationship with his older half-sister, [K.C.]." The court does not make any particular find-

ings regarding S.A, except for the fact that he is J.J.W.'s stepbrother. The record is replete with reference to J.J.W's close relationship with K.C., but contains less information regarding his relationship with S.A. They play together, but the record refers to their interactions in general terms.

With regard to J.J.W.'s adjustment to living with respondent, the court stated that "[J.J.W.] appears to be slightly better adjusted to living at [respondent's] home (farm) near Hewitt, than living with [appellant] in her new home with [Angevine]." The court noted in another factor that J.J.W. "becomes upset when his custody is transferred" from respondent to appellant. The court also noted that respondent has a more stable home, having lived on the family farm his entire life, whereas appellant has moved to six locations in the past five years; has had three romantic partners, one of whom physically abused appellant in J.J.W.'s presence; and J.J.W. currently lives in a two-bedroom mobile home with his mother and stepfather, S.A., K.C., and a baby due in July 2004. The record supports these findings.

 A district court "may not use one factor to the exclusion of all others." Minn.Stat. § 518.17, subd 1(a) (2004). The law "leaves scant if any room for an appellate court to question the [district] courts balancing of best-interests considerations." *Vangsness v. Vangsness,* 607 N.W.2d 468, 477 (Minn.App.2000). The district court made specific findings regarding each best interests factor. In its memorandum discussing the application of the factors to the sole custody determination, the court noted that respondent has shown "greater stability in his living circumstances since [J.J.W.'s] birth and has a more stable family environment than [appellant]." The court also noted the permanency of respondents life plans, as well as appellants

multiple romantic relationships, frequent moves, and unstable work life since J.J.W.s birth. Finally, the court noted the tone of familial relationships of the two families, commenting on the fact that there is animosity between appellant and her father and his girlfriend, which has created significant verbal disputes involving considerable profanity in her home in the presence of the children. When viewing the record in the light most favorable to the district courts findings, we conclude that the findings supporting the award of sole physical custody of J.J.W. to respondent are not clearly erroneous and that the courts decision was not an abuse of discretion.

### III.

 A district courts decision to deny a new trial motion is within its sound discretion and will not be disturbed on appeal absent a clear abuse of that discretion. *Myers v. Hearth Techs., Inc.,* 621 N.W.2d 787, 790 (Minn.App.2001), *review denied* (Minn. Mar. 13, 2001). A district courts denial of a motion for new trial is not an abuse of discretion when the causes justifying a new trial, as listed in Minn. R. Civ. P. 59.01, have not been shown to exist. *See Tovsland v. Tovsland,* 358 N.W.2d 700, 702 (Minn.App.1984). Rule 59 establishes the grounds and procedures that determine when a new trial may be granted. The purpose of a motion for a new trial is to permit the correction of errors by the trial judge without requiring an appeal. *Pierce v. Nat'l Farmers Union Prop. & Cas. Co.,* 351 N.W.2d 366, 368 (Minn.App. 1984). In order to grant a new trial, a court must find a cause specified in the rules and must further find that prejudice has resulted to the opposing party. *See Meagher v. Kavli,* 256 Minn. 54, 62, 97 N.W.2d 370, 376 (1959).

Appellant argues that newly discovered evidence, the genetic test results, was not available until after the trial and the parties were not "allowed to address the [e]ffect of the results" to the court. She therefore asserts that a new trial should be granted or that the matter be remanded for the taking of additional evidence relating to the test results.

At the conclusion of the trial, the attorneys and the court discussed the receipt of the test results. The court allowed the parties to submit their final arguments and proposed findings seven days after the receipt of the test results so they could address the results in their submissions, to which appellant's counsel agreed. Appellant made no request to leave the record open.

In appellant's motion for a new trial, she did not specify any ground for which the court should grant a new trial. She stated that if the court does not grant her request for amended findings, conclusion, and order, "it would be the request of [appellant] that the Court order a new trial in light of the genetic test results which were received following hearing of this matter on March 2, 2004." Nothing else is stated regarding a new trial. The district court noted in its memorandum regarding the motion for a new trial that appellant's motion "does not set forth the 'grounds' for the motion under Rule 59.01. Therefore, the motion for a new trial must be denied on that basis." *See Waldner v. Peterson,* 447 N.W.2d 217, 219 (Minn.App. 1989). The court nonetheless reviewed the record and concluded that "no errors occurred during the conduct of the trial, which were unreasonably prejudicial to [appellant]."

The court did address the test results in its conclusions and memorandum. Based on the court's analysis, the results did not affect its determination because there was no other man claiming to be J.J.W.'s father. Further, even though the court erred in ordering the tests, any error based on newly discovered evidence relating to the test results would be harmless.

### DECISION

Because the recognition of parentage was never properly vacated, it continues to have the force and effect of a judgment or order that respondent is the adjudicated father. While the district court erred in ordering the genetic tests because appellant never filed the required affidavit, such error was harmless because no other man is presumed to be J.J.W.'s father. The district court's findings regarding the application of the best interests factors support the court's award of sole physical custody to respondent. Because the district court addressed the genetic tests in its conclusions and order, and because no errors occurred at trial that unreasonably prejudiced appellant, the court did not err in denying appellant's motion for a new trial.

**Affirmed.**