Thomas R. Braun, Brenton M. Tunis, Restovich Braun & Associates, Rochester, Minnesota (for respondent)
Susan A. Daudelin, Henschel Moberg, P.A., Minneapolis, Minnesota (for appellants)
Jill I. Frieders, O'Brien & Wolf, L.L.P., Rochester, Minnesota (for guardian ad litem )
Considered and decided by Ross, Presiding Judge; Johnson, Judge; and Tracy M. Smith, Judge.
JOHNSON, Judge *327 This is a parentage action to determine who is the father of a four-year-old boy. One man, who signed a recognition of parentage, was presumed to be the father because he was living with the boy's mother when the boy was born and represented to others that he was the boy's father. Another man was presumed to be the father because genetic testing showed that he is the boy's biological father. The district court resolved the competing presumptions of paternity by concluding that the biological father should be adjudicated the child's legal father. The district court also awarded the biological father and the mother joint legal custody. The mother and the other presumed father appeal. For the reasons stated below, we affirm.
FACTS
In August 2013, K.N. learned that she was pregnant. The district court found that K.N. knew that she had become pregnant because of sexual intercourse with A.S. At that time, she was married to but separated from K.W. In addition, she was sharing a home with J.N., who had been a friend and a business partner and later became her intimate partner, and in January 2017, her husband. As their relationship progressed in 2013, K.N. and J.N. decided to raise the child together after K.N. gave birth.
In April 2014, K.N. gave birth to a baby boy, C.F.N. At the hospital, K.N. and J.N. signed a recognition of parentage (ROP), in which they stated under oath that they are the biological parents of C.F.N. Soon thereafter, K.W. executed a voluntary statement of non-paternity, which was filed with the state registrar along with the ROP. K.N.'s marriage to K.W. was dissolved in December 2015.
In January 2016, when C.F.N. was two years old, A.S. received a message via social media from a person he did not know stating that A.S. likely is the biological father of K.N.'s child. Before receiving that message, A.S. was aware that K.N. had a young child but did not know the age of the child and assumed that J.N. was the child's father and, thus, had no reason to believe that he might be the biological father of the child. A.S.'s mother and sister attempted to communicate with K.N. about the child on A.S.'s behalf, but K.N. refused to engage in such communications.
In February 2016, A.S. commenced this paternity action. He alleged that he is the biological father of C.F.N. and sought an order adjudicating him as the boy's legal father. He also sought an award of sole legal custody and sole physical custody of C.F.N. He named K.N. as the sole respondent.
In March 2016, the district court held an initial hearing. A.S. requested an order authorizing genetic testing. K.N. voluntarily agreed to genetic testing, which made it unnecessary for the district court to rule on A.S.'s request. The genetic test determined that, based on certain unchallenged assumptions, the probability of A.S.'s paternity is 99.99999999 percent.
In June 2016, A.S. moved to vacate the ROP that had been executed by K.N. and J.N. Meanwhile, K.N. and J.N. separately moved to dismiss A.S.'s paternity action on *328 the grounds that A.S. did not join J.N. and that A.S. did not have standing to commence or maintain the action. In the alternative, J.N. moved to intervene. After a hearing on the motions, the district court filed an order in November 2016 in which it denied the motions to dismiss and granted J.N.'s motion to intervene. In January 2017, the district court filed an order in which it appointed a guardian ad litem "to advocate for the best interests of the ... minor child." In February 2017, the district court formally joined C.F.N. as a party and appointed a different guardian ad litem .
The case was tried to a referee on two days in April 2017. A.S. testified that he and K.N. were in a romantic relationship from June 2013 until August 10, 2013, when they agreed to terminate their relationship. He testified that they voluntarily had sexual intercourse approximately 20 times during that time period. A.S. called two additional witnesses, his mother and his sister, who testified about their knowledge of his relationship with K.N. and A.S.'s ability and willingness to be a father. K.N. testified that she saw A.S. only six or seven times in the summer of 2013 and that she did not have a romantic or intimate relationship with him. She testified that they had sexual contact on only one occasion, on July 27, 2013, but that it was not consensual. The district court found that K.N.'s testimony was not credible. J.N. testified that he knew that he was not the biological father of C.F.N. when he signed the ROP. K.N. and J.N. also called J.N.'s step-mother and K.W.'s mother as witnesses to testify about their knowledge of C.F.N.'s paternity and K.N.'s and J.N.'s parenting abilities. A.S. called two rebuttal witnesses. His roommate in the summer of 2013 testified that A.S. and K.N. appeared to be in an intimate relationship and that K.N. spent the night with A.S. at their apartment approximately 15 times. A mutual acquaintance testified that K.N. told her in August 2013 that she had become pregnant because of sexual intercourse with A.S. but that she was not going to tell him about the pregnancy.[1] The guardian ad litem testified that J.N. should be adjudicated the father of C.F.N. and that A.S. should be introduced to C.F.N. at a later date, after consultation with a therapist.
In July 2017, the referee issued a 39-page order with findings of fact, conclusions of law, a recommended order, and a memorandum. The referee recommended that A.S. be adjudicated the legal father of C.F.N., that C.F.N.'s birth certificate be changed to reflect that A.S. is the father, that K.N. and A.S. be awarded joint legal custody, and that K.N. be awarded temporary sole physical custody. The referee's recommendation also stated, "This order has the effect of vacating the Recognition of Parentage signed by Mother and [J.N.]." The referee's analysis was reflected primarily in the memorandum. The referee reviewed the law governing competing presumptions of paternity, applied the statutory best-interests factors, and discussed additional policy considerations, such as A.S.'s biological connection to C.F.N., the relevance of K.N.'s relationships with her former husband and her present husband, and the fact that K.N. and J.N. signed the ROP despite knowing that J.N. was not the biological father. The referee concluded that "the weightier considerations of logic and policy require that *329 Petitioner be adjudicated the legal father of C.F.N." A district court judge approved the recommendation, and judgment was entered. K.N. and J.N. appeal and raise multiple issues.
ISSUES
I. Did the district court err by ruling that A.S. had standing to commence and maintain this paternity action?
II. Did the district court err in its analysis of the applicable statutes and in its conclusion that A.S. should be adjudicated the legal father of C.F.N.?
III. Did the district court err by awarding joint legal custody of the child to K.N. and A.S.?
IV. Did the district court commit reversible error by not joining J.N. and C.F.N. as parties at an earlier stage of pre-trial proceedings and by not joining K.W.?
ANALYSIS
This appeal arises under the Minnesota Parentage Act (MPA), which spans 26 sections of the Minnesota Statutes. See Minn. Stat. §§ 257.51 -.74 (2018).
The Parentage Act provides a statutory framework for determining parentage. Generally, the Parentage Act defines the parent-child relationship, describes certain presumptions of paternity, and sets forth the procedure for bringing an action in district court to determine the father-child relationship, as well as the mother-child relationship. See Minn. Stat. §§ 257.52, .55, .57, .60. Under the Parentage Act, the biological mother or a man presumed or alleged to be the father may bring an action, subject to certain time limits, to determine the existence of the father-child or mother-child relationship. Minn. Stat. § 257.57, subds. 1-2.
In re Custody of D.T.R. , 796 N.W.2d 509, 511 (Minn. 2011). Accordingly, the act "creates causes of action for individuals seeking to establish the existence or nonexistence of a father-child relationship." In re Estate of Jotham , 722 N.W.2d 447, 451 (Minn. 2006) (citing Minn. Stat. § 257.57 (2004) ).
I.
K.N. and J.N. first argue that the district court erred by denying their motions to dismiss A.S.'s paternity action. They contend that A.S. did not have standing to commence and maintain the action on the grounds that the ROP they had executed conclusively determined that J.N. is C.F.N.'s father, that A.S. did not have standing to file a motion to vacate the ROP, and that A.S. had not obtained genetic testing before commencing the action. This court applies a de novo standard of review to a district court's determination that a party has standing to bring a paternity action. Zentz v. Graber , 760 N.W.2d 1, 4 (Minn. App. 2009), review denied (Minn. Mar. 31, 2009).
The MPA "declares who may bring an action for the determination of the father and child relationship." Morey v. Peppin , 375 N.W.2d 19, 22 (Minn. 1985) (citing Minn. Stat. § 257.57 (1984) ). "The right to bring a proceeding to establish paternity is totally a creature of the MPA," which means that the statutory provisions concerning who may bring an action are "the exclusive bases for standing to bring an action to determine paternity." Witso v. Overby, 627 N.W.2d 63, 65-66 (Minn. 2001).
"Whether and when a person may bring a paternity action depends on which presumptions of paternity, if any, apply." Id. at 66 (citing Minn. Stat. § 257.57 (2000) ). The relevant statute provides for standing in three circumstances. See Minn. Stat. § 257.57, subds. 1-3 (2018). First, if a man *330 is presumed to be the biological father of a child due to his marriage to the mother, a paternity action may be brought by the child, the mother, or the presumed father. Minn. Stat. § 257.57, subd. 1 (citing Minn. Stat. § 257.55, subd. 1(a)-(c) ). Second, if a man is presumed to be the biological father of a child for reasons other than marriage, a paternity action may be brought by the child, the mother, the presumed father, or certain other persons. Id ., subd. 2 (citing Minn. Stat. §§ 257.55, subd. 1(d), (e), (g), (h), 257.62, subd. 5(b) ). Third, if there is no presumed father, a paternity action may be brought by the child, the mother, or certain other persons. Id ., subd. 3.
A.S. contends that he has standing for the second of the three possible reasons. The relevant statutory provision states:
The child, the mother, or personal representative of the child, the public authority chargeable by law with the support of the child, the personal representative or a parent of the mother if the mother has died or is a minor, a man alleged or alleging himself to be the father , or the personal representative or a parent of the alleged father if the alleged father has died or is a minor may bring an action :
(1) at any time for the purpose of declaring the existence of the father and child relationship presumed under sections 257.55, subdivision 1, paragraph (d), (e), (g), or (h), and 257.62, subdivision 5, paragraph (b), or the nonexistence of the father and child relationship presumed under section 257.55, subdivision 1, clause (d)....
Minn. Stat. § 257.57, subd. 2 (emphasis added).
A.S. had standing to commence and maintain a paternity action under paragraph 1 of subdivision 2 for one or two reasons. At the least, he had standing on the ground that he sought to declare the existence of his own father-and-child relationship, which was presumed to exist by section 257.62, subdivision 5, paragraph (b). That provision states, "If the results of blood or genetic tests completed in [an accredited] laboratory ... indicate that likelihood of the alleged father's paternity ... is 99 percent or greater, there is an evidentiary presumption that the alleged father is the biological father...." Minn. Stat. § 257.62, subd. 5(b) (2018). In addition, he likely had standing on the ground that he sought indirectly to declare the non-existence of J.N.'s father-and-child relationship, which was presumed to exist by section 257.55, subdivision 1, clause (d). See Kelly v. Cataldo , 488 N.W.2d 822, 827 (Minn. App. 1992), review denied (Minn. Sept. 15, 1992). That provision states that a man is presumed to be the biological father of a minor child if "he receives the child into his home and openly holds out the child as his biological child." Minn. Stat. § 257.55, subd. 1(d) (2018). But we need not decide whether A.S.'s paternity action had only the former purpose or had both purposes.
K.N. and J.N. do not contend that A.S. has not satisfied the requirements of section 257.57, subdivision 2. Rather, they contend that A.S. could not commence and maintain his paternity action for three other reasons.
First, K.N. and J.N. contend that A.S. could not maintain this paternity action because the ROP executed by K.N. and J.N. is "conclusive." They rely on the following provision in the statute governing a ROP:
[1] Subject to subdivision 2 and section 257.55, subdivision 1, paragraph (g) or (h), the recognition has the force and effect of a judgment or order determining the existence of the parent and child relationship under section 257.66. [2] If *331 the conditions in section 257.55, subdivision 1, paragraph (g) or (h), exist, the recognition creates only a presumption of paternity for purposes of sections 257.51 to 257.74. [3] Once a recognition has been properly executed and filed with the state registrar of vital records, if there are no competing presumptions of paternity, a judicial or administrative court may not allow further action to determine parentage regarding the signator of the recognition.
Minn. Stat. § 257.75, subd. 3(a) (2018) (emphasis added). Specifically, they rely on the language italicized above, which states that a ROP has the "force and effect of a judgment or order determining the existence of the parent and child relationship." See id . But that language does not expressly preclude a paternity action concerning a child whose paternity is addressed by a ROP; rather, that language states merely that a ROP is equivalent to a court order or judgment. The language in the statute that might preclude a putative father from commencing a paternity action is found in the third sentence of the statute, which states, "Once a recognition has been properly executed and filed ... if there are no competing presumptions of paternity , a judicial or administrative court may not allow further action to determine parentage regarding the signator of the recognition." Id. (emphasis added). The MPA provides for at least three circumstances in which a ROP gives rise to a presumption that a man is the biological father of a child. See Minn. Stat. § 257.55, subd. 1(f)-(h). The fact that the existence of a ROP gives rise only to a presumption of paternity demonstrates that a ROP is not conclusive if a person who is not a party to the ROP commences a paternity action. In this case, the exception in the middle of the third sentence is triggered because there is a "competing presumption": genetic testing gave rise to a presumption that A.S. is C.F.N.'s biological father. See Minn. Stat. § 257.62, subd. 5(b). For that reason, A.S. is not precluded by the ROP from commencing and maintaining a paternity action.[2] K.N. and J.N. cite Williams v. Carlson , 701 N.W.2d 274 (Minn. App. 2005), in support of their contention, but that case is distinguishable because both parties to the paternity action had signed a ROP. Id. at 277. The Williams opinion does not foreclose a paternity action by a person who is not a party to a ROP.
Second, K.N. and J.N. contend that A.S. could not commence and maintain this paternity action because he did not have standing to move to vacate the ROP. In light of the plain language of the statute governing a ROP, it appears that A.S., who was not a party to the ROP, is not among the persons who may move to vacate a ROP. See Minn. Stat. § 257.75, subd. 4.[3] But vacatur of a ROP is not a prerequisite to relief under the MPA. As stated above, the Parentage Act is "a statutory framework for determining parentage." D.T.R. , 796 N.W.2d at 511. But the ROP statute is not part of the MPA; rather, the ROP statute is the section that immediately follows the MPA. See Minn. Stat. § 257.51 (2018) (stating that " Sections 257.51 to 257.74 may be cited as the Parentage Act"); Minn. Stat. § 257.75 (2018) (authorizing recognition of parentage). Furthermore, *332 the MPA provides "the exclusive bases for standing to bring an action to determine paternity." Witso, 627 N.W.2d at 65-66. Accordingly, A.S.'s paternity action did not and does not depend on the validity or invalidity of the ROP. Although A.S. moved to vacate the ROP, it was unnecessary to do so. The district court did not rule on A.S.'s motion to vacate the ROP. Rather, the district court simply stated in its final order that the order "has the effect of vacating the Recognition of Parentage signed by Mother and [J.N.]." See Minn. Stat. § 257.66, subd. 1.
Third, K.N. and J.N. contend that A.S. could not commence and maintain this paternity action because, when he commenced the action, he "did not yet have genetic test results which established the requisite likelihood that he was C.F.N.'s biological father." Their contention is contrary to supreme court caselaw. In Witso , the supreme court held that "a party alleging he is a child's father has standing to bring a paternity action under section 257.57, subdivision 2 to compel blood or genetic testing as provided in section 257.62, subdivision 1 even though he does not at the time the action is commenced possess blood or genetic tests that establish he is the child's presumed father." 627 N.W.2d at 69. K.N. and J.N. contend in their reply brief that Witso is distinguishable on the ground that there was no ROP in that case. The absence of a ROP in Witso does not make the case distinguishable. The putative father in Witso was in the same predicament as A.S.-a predicament that the supreme court described as "a chicken-or-egg dilemma." Id. at 67. The supreme court reasoned that, "[i]f a putative father were required to be a presumed father" before commencing a paternity action, "the mother could foreclose the putative father from obtaining the test results to prove paternity." Id. The supreme court also noted that, if there is no presumption based on marriage, the statute governing standing allows both presumed fathers and "alleged" fathers to commence a paternity action. Id. These reasons apply equally to the present case, notwithstanding the existence of a ROP.
Thus, the district court did not err by denying K.N.'s and J.N.'s motions to dismiss.
II.
K.N. and J.N. next argue that the district court erred by concluding that A.S. should be adjudicated the legal father of C.F.N.
"If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." Minn. Stat. § 257.55, subd. 2. The MPA does not provide additional guidance on how a district court should decide which presumption should control, except to say, "A determination under this subdivision [concerning positive genetic test results] that the alleged father is the biological father does not preclude the adjudication of another man as the legal father under section 257.55, subdivision 2." Minn. Stat. § 257.62, subd. 5(c). This court has stated that, in determining which presumption should control, a district court must examine the particular facts of the case and may consider any relevant factors. In re Welfare of C.M.G. , 516 N.W.2d 555, 561 (Minn. App. 1994) ; Kelly , 488 N.W.2d at 827. Furthermore, the child's best interests "is a valid policy factor in resolving a conflict between competing paternity presumptions," C.M.G. , 516 N.W.2d at 560, but the child's best interests are "not intended to be dispositive in resolving conflicting paternity presumptions," In re Paternity of B.J.H. , 573 N.W.2d 99, 102 (Minn. App. 1998). Other *333 appropriate factors include the child's existing relationships with the presumed fathers and the traditional significance of marital and blood relationships. Id. at 103 ; C.M.G. , 516 N.W.2d at 561 ; Kelly , 488 N.W.2d at 827.
In this case, the district court was faced with the task of resolving two competing presumptions. J.N. was a presumed father because he received C.F.N. into his home and openly held him out as his child. See Minn. Stat. § 257.55, subd. 1(d). A.S. was a presumed father because genetic testing showed a greater-than-99-percent probability that he is C.F.N.'s biological father, which gives rise to "an evidentiary presumption that [he] is the biological father." See Minn. Stat. § 257.62, subd. 5(b). The district court considered a variety of factors, including the statutory best-interests factors that govern child custody, see Minn. Stat. § 518.17, subd. 1 (2018) ; A.S.'s biological connection to C.F.N.; the impact of K.N.'s marital relationship with J.N.; and K.N.'s and J.N.'s concealment of A.S.'s biological connection to C.F.N. when they signed the ROP. The district court noted that A.S. has not had an opportunity to be a part of C.F.N.'s life in any way. As a result, the district court noted that certain factors, such as the child's needs and history of child care, deserve less weight or no weight at all.
K.N. and J.N. contend that the district court erred in its analysis in three ways. First, they contend that the district court erred by applying a "mistaken belief that A.S.'s biological connection to C.F.N. constitutes a dominant presumption." Likewise, the guardian ad litem contends that the district court improperly considered the biological relationship between A.S. and C.F.N. to be dispositive in reaching its decision. In response, A.S. argues that the district court appropriately considered the biological relationship between A.S. and C.F.N. as one of many factors in its analysis. Our review of the district court's decision indicates that the district court considered numerous factors, only one of which is the biological relationship between A.S. and C.F.N. The district court did not err by placing too much weight on that factor.
Second, K.N. and J.N. contend that the district court erred on the ground that the ROP should have, in essence, operated as a conclusive determination of paternity that supersedes the presumption based on genetic testing. This contention is, more or less, a reformulation of the contention that the ROP precludes a paternity action, which we already have rejected. See supra part I.B.
Third, K.N. and J.N. contend that the district court erred on the ground that they did not commit "fraud" when they executed the ROP. The district court did not make a formal finding of "fraud" for purposes of A.S.'s motion to vacate the ROP. See Minn. Stat. § 257.75, subd. 4(b). Indeed, the district court did not rule on A.S.'s motion to vacate the ROP. Rather, the district court simply referred to K.N.'s and J.N.'s "fraudulent execution of a ROP" when making findings of historical fact. But that finding is without any particular legal consequence. The same is true of the heading, "Fraud," in the midst of the district court's analysis of the competing presumptions. Below that heading, the district court did not use the words "fraud" or "fraudulent" but referred to K.N.'s and J.N.'s "execution of the Recognition of Parentage ... where both Mother and [J.N.] knew [J.N.] was not the biological father of C.F.N." and commented that their actions have "significant public policy implications." The substance of the district court's consideration of K.N.'s and J.N.'s actions with respect to the ROP is not inappropriate in any way.
*334 Thus, the district court did not err in its analysis of the competing presumptions of paternity or in its conclusion that A.S. should be adjudicated the father of C.F.N.
III.
K.N. and J.N. next argue that the district court erred by awarding joint legal custody to K.N. and A.S.
"Legal custody" is defined by statute to mean "the right to determine the child's upbringing, including education, health care, and religious training." Minn. Stat. § 518.003, subd. 3(a) (2018). Accordingly, " 'Joint legal custody' means that both parents have equal rights and responsibilities, including the right to participate in major decisions determining the child's upbringing, including education, health care, and religious training." Id ., subd. 3(b). In determining which parent or parents should have custody of a child, a district court must consider the best interests of the child and make a custody award that serves those interests. Minn. Stat. § 518.17, subd. 1 (2018) ; Olson v. Olson , 534 N.W.2d 547, 549 (Minn. 1995) ; Pikula v. Pikula , 374 N.W.2d 705, 711 (Minn. 1985). In considering the child's best interests, a district court must consider "all relevant factors," including 12 factors prescribed by statute. See Minn. Stat. § 518.17, subd. 1(a). In doing so, the district court "may not use one factor to the exclusion of all others, and the court shall consider that the factors may be interrelated." Id. , subd. 1(b)(1). Joint legal custody should be awarded only if the parents "can cooperatively deal with parenting decisions." Rosenfeld v. Rosenfeld , 529 N.W.2d 724, 726 (Minn. App. 1995) (quotation omitted).
To the extent that a party challenges a district court's findings on factual issues relevant to custody, this court applies a clear-error standard of review. Pikula , 374 N.W.2d at 710 ; Schallinger v. Schallinger , 699 N.W.2d 15, 19 (Minn. App. 2005), review denied (Minn. Sept. 28, 2005). If the facts are not in dispute, we apply an abuse-of-discretion standard of review to a district court's award of child custody. Pikula , 374 N.W.2d at 710 ; In re M.R.P.-C. , 794 N.W.2d 373, 378 (Minn. App. 2011). A trial court has broad discretion in making custody decisions; there is "scant if any room" for this court to question a district court's balancing of best-interests considerations. Vangsness v. Vangsness , 607 N.W.2d 468, 476-77 (Minn. App. 2000).
In this case, the district court concluded that it is in the best interests of C.F.N. to award joint legal custody to A.S. and K.N. as well as temporary sole physical custody to K.N. The district court expressed some concern about the parties' ability to "cooperate in raising C.F.N., maximize sharing information, and minimize exposure to parental conflict." But the district court noted "the assertions by all parties that they will cooperate and work with professionals to transition [A.S.] into C.F.N.'s life." The district court concluded by stating that it was "satisfied in awarding joint custody."
K.N. and J.N. contend that the district court erred by not conducting a separate analysis of the statutory best-interests factors for purposes of custody, in addition to its analysis of the statutory best-interests factors for purposes of paternity. The best-interests factors enumerated in section 518.17, subdivision 1, are relevant to both issues. See Schallinger , 699 N.W.2d at 19 ; C.M.G. , 516 N.W.2d at 560. In this case, the district court thoroughly analyzed those factors, one by one, sometimes with respect to the issue of paternity, sometimes with respect to the issue of custody, and sometimes with respect to both issues. There is no requirement *335 that the district court conduct two separate analyses of the statutory best-interests factors.
K.N. and J.N. also contend that the district court's "determination that joint legal custody is appropriate ... is not supported by the evidence." To the contrary, both A.S. and K.N. testified that they would be willing to communicate with each other in order to do what is best for C.F.N. This evidence supports the district court's determination that the parties will be sufficiently cooperative to make joint legal custody appropriate. It is apparent that the parties' ability and willingness to cooperate was not the most significant factor in favor of joint legal custody. But their ability and willingness to cooperate was not so lacking that the award of joint legal custody is an abuse of discretion. See Berthiaume v. Berthiaume , 368 N.W.2d 328, 332-33 (Minn. App. 1985).
Thus, the district court did not err by awarding joint legal custody to K.N. and A.S.
IV.
K.N. and J.N. also argue that the district court erred by not joining C.F.N. and J.N. as parties at an earlier stage of pre-trial proceedings and by not joining K.W. at any time. The issue of who should be a party to a paternity action is governed by statute. See Minn. Stat. § 257.60 (2018).
A.
The child whose parentage is at issue "may be made a party to the action." Id . In addition, the child "shall be made a party" if "the action is to declare the nonexistence of the father and child relationship." Minn. Stat. § 257.60(2). Furthermore, the child "shall be made a party" if "an action to declare the existence of the father and child relationship is brought by ... a man who alleges to be the father, and the mother of the child denies the existence of the father and child relationship." Minn. Stat. § 257.60(3).
C.F.N. was required to be made a party under section 257.60(2). The primary purpose of A.S.'s paternity action was to declare the existence of his own father-and-child relationship, but the inevitable consequence of such a declaration would be a declaration of "the nonexistence of the father and child relationship" between J.N. and C.F.N. See Minn. Stat. § 257.60(2) ; Kelly , 488 N.W.2d at 826.[4]
As far as the record reveals, neither K.N. nor any other party or putative party ever asked the district court to make C.F.N. a party. It appears that the district court made C.F.N. a party on its own initiative in February 2017. K.N. and J.N. have not cited any authority for the proposition that the district court erred by not making C.F.N. a party on a sua sponte basis at an earlier stage of the case. K.N. and J.N. assert that C.F.N.'s interests should have been represented in pre-trial proceedings in 2016, but they do not identify any particular way in which pre-trial rulings might have been different. Furthermore, the guardian ad litem has not pursued this issue on appeal. Accordingly, *336 the district court did not err by not sua sponte joining C.F.N. as a party earlier than February 2017.
B.
"[E]ach man presumed to be the father under section 257.55... shall be made parties." Minn. Stat. § 257.60. Because J.N. was a presumed father under section 257.55, subdivision 1(d), he was required to be made a party. See id. A.S. did not make him a party when commencing the action in February 2016. It appears that neither K.N. nor any other party or putative party brought the issue to the district court's attention before J.N. moved to dismiss or to intervene in June 2016. The district court granted J.N.'s motion to intervene in November 2016. K.N. and J.N. have not cited any authority for the proposition that the district court erred by not making J.N. a party on a sua sponte basis at an earlier stage of the case.
K.N. and J.N. contend that reversal is required by County of Dakota v. Blackwell , 809 N.W.2d 226 (Minn. App. 2011), in which this court reversed and remanded a district court's paternity decision because the district court had denied the biological father's motion to join another presumed father. Id. at 228-30. The Blackwell opinion is distinguishable for several reasons. The district court in that case denied a motion to join another presumed father as a party. Id. at 228. The other presumed father never was made a party to the case. Id. at 228-30. In the absence of the other presumed father, the district court did not conduct the analysis required to resolve competing presumptions. See id. at 229. In this case, however, the district court granted J.N.'s motion to intervene, J.N. remained a party for the duration of district court proceedings, and the district court considered J.N.'s status as a presumed father and resolved the competing presumptions.
Even if K.N. and J.N. could establish error, they could not show that either of them was prejudiced by the delayed joinder. J.N. contends that, because he was not yet a party, he was unable to advocate for his interests in March 2016, when the district court considered A.S.'s request for genetic testing. But it appears that J.N. could not have asserted a valid objection because A.S. was entitled to genetic testing as a matter of law, assuming he had standing to commence and maintain the action. See Minn. Stat. 257.62, subd. 1(a). Even though J.N. was not yet a party, his attorney was permitted to present oral argument to the district court on his motion to dismiss the action for lack of standing. K.N. and J.N. also suggest that they were prejudiced when J.N. was deposed in May 2016 and gave testimony concerning his execution of the ROP. But it appears from the record that J.N. was represented by counsel at that time because he indicated in his testimony that he was being represented by the same attorney who was representing K.N. In addition, we have concluded that the validity or invalidity of the ROP is not relevant to A.S.'s standing to commence and maintain a paternity action. See supra part I.B. K.N. and J.N. have not identified any other way in which either of them suffered prejudice as a result of the fact that J.N. was not made a party until November 2016. Accordingly, any error by the district court would be harmless. See Minn. R. Civ. P. 61.
C.
K.W. might have been a presumed father because he was married to K.N. when C.F.N. was born. See Minn. Stat. § 257.55, subd. 1(a). But that presumption "does not apply if the man has joined in a recognition of parentage recognizing another man as the biological father under *337 section 257.75, subdivision 1a." Id. Because K.W. executed a voluntary statement of non-paternity, he was not a person who was required to be made a party to the action. In fact, no party ever asked the district court to make him a party. K.N. and J.N. assert that K.W.'s non-paternity was potentially at issue during the pendency of A.S.'s motion to vacate the ROP. See Minn. Stat. § 257.75, subd. 4(a). But they do not contend that, under the relevant statute, such a possibility required that K.W. be made a party. Accordingly, the district court did not err by not joining K.W. as a party.
Thus, the district court did not commit reversible error by not joining C.F.N. and J.N. as parties at an earlier stage of pre-trial proceedings or by not joining K.W. at any time.
DECISION
In sum, the district court did not err by adjudicating A.S. as the legal father of C.F.N. and did not err by awarding joint legal custody to K.N. and A.S.
Affirmed.

This witness's testimony was corroborated by an exhibit depicting text messages sent to her by K.N. On August 13, 2013, K.N. wrote, "I would love your thoughts on whether or not I should tell [A.S.]. I had decided before I found out that I wasn't going to stay with him. He would not make a very good/reliable father and I really don't want him to know." K.N. later wrote another text message, stating, "I'm thinking like never telling him."

Accordingly, we need not determine whether K.N. and J.N. "properly executed" the ROP or whether A.S.'s paternity action is an action "regarding [a] signator of the [ROP]." See Minn. Stat. § 257.75, subd. 3(a).

The pertinent part of the statute states, "An action to vacate a recognition of paternity may be brought by the mother, father, husband or former husband who executed a joinder, or the child." Minn. Stat. § 257.75, subd. 4(a).

C.F.N. was not required to be made a party under section 257.60(3), which would apply only if K.N. "denie[d] the existence of [A.S.'s] father and child relationship." See Minn. Stat. § 257.60(3). K.N. opposed A.S.'s action and sought to have it dismissed. But she did not oppose it on the ground that he did not have a father-and-child relationship because she did not deny (and, in fact, admitted) that he is the biological father of C.F.N. See Spaeth v. Warren , 478 N.W.2d 319, 321 (Minn. App. 1991) (concluding that child was not required to be joined because mother conceded that man was child's biological father), review denied (Minn. Jan. 30, 1992).